Intellectual Ventures II against Commerce Bancshares, Mr. Picard. Now, Mr. Picard, we appreciate that there are overlap, that these cases are listed separately, but let's just start with our full case for the first one that's listed here. And then when there are things to fill in, we can go into greater detail with the others. Very good, Your Honor. Thank you. Byron Picard on behalf of the appellant, Intellectual Ventures. May it please the Court, this appeal presents two claim construction errors in the Board's anticipation rulings in the IPR below. Claim 26 of the patent at issue is the only independent claim involved in this appeal. And Claim 26 recites a data collection and processing center. And of relevance to this appeal, it requires that the data collection and processing center do two things first or be capable of doing two things. That is, identifying an anomaly and that it do so in a particular way, that is by analyzing data entering into a plurality of hosts, servers, and computer sites. The analyzing the data step, the Board's error below was to broadly construe that claim to allow the instance where information about the network traffic to satisfy that limitation. And to understand... Can I just ask this? The common claim construction issue between the two cases can be summarized, maybe you even have summarized it or the Board has, is whether indirect analysis of data by the central unit, even when the central unit doesn't have any of the data itself, the network entering data itself, can, under a broadest reasonable interpretation standard, be covered by the claim language that the central unit must analyze the data. I think that well summarizes that issue. So why is that not one reasonable understanding of analyzing data in something like the same way that the term meta-analysis is used, as I understand it, you can correct me if I'm wrong, to refer to analyzing data by analyzing earlier studies of that data, even if the direct data is not presented to the meta-analyst? I'm not sure the meta-analyst paradigm, if you will, has been introduced, at least not in those terms. No, but I'm trying to get a grip on the language. You make a kind of ordinary language argument that the central unit doesn't analyze data that it doesn't see, and the Board at the core said that's not really quite right. You can reasonably say the central unit analyzes data by analyzing an analysis, even if it gets only the results of the analysis and not the data. And I don't think that's fair because if we look at the plain language, start with the plain language for Claim 26. Claim 26 has the comprising limitation, comprising analyzing data entering into a plurality of host servers and computer sites. So data about that data, or metadata, are not the data that have entered into the host servers and computer sites, and the specification is consistent and supports that reading. For example, Column 7, and one of the advantages of the invention, I think it's important to keep in mind, is that in the prior art approach you would have these distributed network modules. They did their own isolated or module host-based intrusion detection, and they would report the fact of an anomaly to some other component of the system. The advantage of the OA4 patent was that you could get a broader scope of detection by looking at data from many of those sources. On page 9 of the reply brief in the other case, and I'm sure you agree with this, it says we're not saying that it has to analyze all of the data. It's sufficient if it analyzes some of the data. But isn't it clear that in both of these prior art references that summaries of the data are being analyzed? It isn't just taking a conclusion from the peripheral computer. It is also taking summaries of the data that are provided by the peripheral computers. In the case of the Porus reference, which is in the second IBM appeal, I don't believe that there is substantial evidence that shows what's in fact in those anomaly reports. Well, let's talk about Oxma. I think there is in the Porus reference a specific reference to considering summaries of the data. In other words, they're not just taking a conclusion from the peripheral computers saying, oh, there's an anomaly here. There's a description of what the anomaly is, which includes summaries of the data that's received. Is that wrong? I think it's wrong in that it's not been shown that the summaries that are provided, these anomaly reports in the Porus reference, in fact contain the same data that were delivered to the network modules. It's a different case in the Oxma reference, which is the prior art here. You're saying data has to be raw data. It can't be a summary of data. It seems to me that's what your position is. That's right. The only point in the reply brief there is that we're not requiring that every data packet in a packet-based system be delivered to the centralized processor, but you have to have some of it at least as drafted in Claim 26. Why isn't the broadest reasonable interpretation of data to include summaries of data? Why does it have to be raw data? Because summaries of data do not enter the plurality of host servers and computer sites, which is required by Claim 26. I don't understand what you're saying. Excuse me? I don't understand what you just said. The network modules, which are cited here as the host servers and computer sites, they don't receive summaries of data. They're receiving network traffic. Are you talking about the central server or the peripheral ones? The peripheral ones. So they're receiving network traffic, and that network traffic is not summaries about the data that those are receiving. They're receiving the raw data, and they pass along summaries of the raw data to the central computer. That's right, and that's not the same data that they receive. That's the question of whether that falls within the claim. It is, Your Honor. I think maybe the clearest explanation of why that's outside the scope and why it would not be reasonable to include that data in the claims is to look at the prosecution history. We cited this in our brief. This appears in the Joint Appendix starting at 463. During the prosecution of the 084 patent, a limitation was added, the very limitation that's at issue here. If we look at JA463, they add the limitation, using network-based intrusion detection techniques comprising analyzing data entering into a plurality of host servers and computer sites in the network computer system. And if we look ahead from the same office action response at JA469, the patent applicant explained why that limitation was being added. The reference at issue there was this Rallin reference, and Rallin was a host-based intrusion system, not unlike what we see with Oxmuth and Porus. And the patent applicant made clear that what's being claimed in the 084 patent is a network-based intrusion detection system. And explained by the addition of that limitation, it was attempting to require that the centralized server not just receive reports about anomalies, but receive the data itself. But I don't see that that's inconsistent with receiving summaries of data. Respectfully, Your Honor, we see it differently, and the prosecution history shows that what is required is raw data to be delivered to the centralized processor. And I think Your Honor's question also got to the substance of the Oxmuth reference, which leads to the second claim construction issue, and that is this identifying anomaly limitation in the board's decision in Oxmuth. If we look at Joint Appendix 11, the final written decision, there's really no dispute about what Oxmuth shows. What happens in the so-called indirect method of Oxmuth is you've got these network components called Agents 106. These are the distributed modules. They receive and detect anomalies and then send the summaries on to the centralized network, Server 104, and then Network 104 classifies those anomalous traffic events as either malignant or benign and requiring action. And the dispute there is about whether Server 104 is in fact identifying an anomaly or just classifying them. Because there's no dispute that Oxmuth, for example, those reports have some of the data that's sent to the network modules, which we submit has not been shown to be the case for Porus. If we look there then to the patents, the patent makes it... I'm sorry, you said Oxmuth, the nodes are forwarding to the central unit some of the data that entered the network? Yes, sir. In Oxmuth there is a disclosure that some of the reports that go from the nodes to the central server do include some of the data. And I want to address that head-on, and that's why the identifying an anomaly limitation is important here. The patent makes a distinction between anomaly detection and then subsequent steps of classifying the anomaly as a real threat, a real intrusion, or a false alarm. And if we look to the patents... Where is the distinction from this monitoring and spotting anomalies and reporting them in Oxmuth? So Oxmuth, while in Oxmuth it does receive some of the, what we're calling the raw data here today, Oxmuth's central processor, the Server 104, doesn't use that raw data or analyze that raw data to detect an anomaly. So the claims require that the data collection and processing center do two things. It's got to detect the anomalies, and the way it does so must involve analyzing the... What is the raw data used for? In Oxmuth? Yes. In Oxmuth it's used to classify the anomalous traffic as either a real threat or a benign statistical fluke. And if we look to Column 4 of the OA4 patent... Why isn't that used in detecting an anomaly? So the patent makes a distinction between classifying anomalies as a real threat or a benign statistical fluke, detecting anomalies just to look for that unusual pattern or signature in the traffic itself. And if we look to Column 4 of the OA4 patent at line 4, it says anomaly detection techniques also produce false alarms. Most of the reported anomalies are purely coincidental statistical exceptions and do not reflect actual security problems. What that suggests is that detecting the initial unusual traffic, be it by pattern or signature, that is the anomaly detection. That's different than determining whether the unusual traffic is, in fact, potentially harmful. And we can see another example of that in the description of Figure 4 if we turn to Column 10 of the OA4 patent. And it says the intrusion detection portion of the system receives data from the various intrusion detection systems on the network and analyzes this to detect an attempted intrusion or intrusion reconnaissance activity. And then it says the data is logged and analyzed. If an intrusion is detected, an alert is logged. So it's making a distinction between the detection of the anomaly and then what would happen if it turns out that anomaly is, in fact, a true threat. And then it triggers things like adjusting the sensitivity of the firewalls, alerting network modules, and so on. By the way, on the and so on, which I guess involves Claim 33, what other things, other responses, could the central unit take beyond the two listed in 33 to indicate why the more general language of ALCSMF isn't necessarily referring to adjusting anomaly detection sensitivity and alarm thresholds? Right. So if we look, for example, at Claim 27, in addition to detecting an anomaly, the central processor can determine which of the devices that it expects to be affected by the threatening activity there. I believe 28 has an additional claimed example. So it might, for example, cut that device out of the network. That's right. Let's hear from the other side, and we'll save you a rebuttal, and then we'll continue with the next case and the same patents. Thank you. Okay, Mr. Vandertweet. Thank you. May it please the Court. The Court can affirm the Board's decision on two different grounds in this case. If the Court determines that the Board correctly construed the data limitations in Claim 26, IB does not dispute that anticipation is proper. Alternatively, the Court can affirm the Board's factual findings with regard to the Board's findings that Claim 26 isn't anticipated by ALCSMF, even under the narrow construction proposed by IB. I'd like to turn first to the claim construction issue with respect to the data limitations in Claim 26. So in the briefing, the argument from Intellectual Ventures was that the plain meaning of the claim requires this narrow sense of what it means to monitor the data and analyze the data to detect intrusions. This morning, it morphed a little bit into more of a prosecution disclaimer type argument that wasn't raised below, but I believe the thrust of their argument before this Court is that the plain meaning of analyzing data entering into a plurality of hosts, servers, and computer sites requires that there be this firsthand analysis or the data be raw data. And there's no support in the plain and ordinary meaning of that claim language for these limitations. In fact, if we turn to the 084 patent and we look to the 084 patent for guidance, what does it mean when it says that the Data Collection Processing Center is monitoring data and analyzing this data to detect intrusions? And if we look first, and there's several ways that the 084 patent describes that this can be done. We look first at Column 7, appendix 33. It says that the Data Collection Processing Center receives information from various network devices attached to the computer network. For example, all communications can be sent to the central server, the Data Collection Processing Center. It also says later in Column 7 that certain devices can be used as sensors and sense data traffic and pass their findings on to the Data Collection Processing Center. It's one way that you can get the data in for analysis at the central server. In Column 8, talking about the present invention, it says that suspicious network traffic events are collected, potentially in context, and forwarded to a central database and analysis engine. Then the centralized engine uses pattern correlation across multiple customers' events in order to detect intrusions. And then we've got another way of performing these functions that we're arguing about. It starts at the bottom of Column 8. There it says that the present invention monitors the traffic from plurality of customers, and continuing on in Column 9, line 4, the data that's sent is data from existing customers' conventional intrusion detection systems that's provided to the central database and then analyzed. These data records comprise, for example, a time stamp, a description of the activity, and a source of the probe. So the OA4 patent specification describes numerous ways in which the Data Collection and Processing Center can perform these two functions that are required by Claim 26. And the claim language itself is agnostic as to how these functions are performed. So we believe that the broadest reasonable interpretation in light of the data is to be broad enough to encompass these multiple alternative ways of getting the data from the remote hosts back to the central server. Now there was argument this morning that in the case of Alksmith, the patent owner here admits that in Alksmith certain data that's received by the nodes is sent back and reported back to the central server. And indeed, in Alksmith, it talks about the anomaly is sent back to the central server. So we would agree that there is definitely data because the anomaly is sent back. And if you look at the Alksmith reference, for example, at Appendix 718, it provides notice of the anomaly and can examine the anomaly to determine, at Step 214, if the anomaly constitutes an actual anomaly. And it goes on. Down in Paragraph 45, it expands on this description. In individually examining the anomaly, the server 104 may, for example, search for particular information in the anomaly, such as a network address previously noted as a security problem, a particular query or command associated with a known intrusion pattern or technique, a particular file name or file type associated with a known intrusion pattern or technique, or other similar types of information. And it goes on. So it's clear here that the anomaly is detected at the nodes. This collection of data that was received is sent back to the central server. It's analyzed to determine if it constitutes an actual anomaly. Now Intellectual Ventures argues that what happens at the central server is simply a classification of an already detected anomaly. Well, we would dispute that characterization of the reference. For example, at Figure 2 of AppSmith, at Step 214, server determined actual anomaly, question mark. There's a decision step as to whether there's an anomaly. If you look at paragraph 13 of the AppSmith reference, it says that the server 104 can also use possible security problems reported by all of the agents, 106, 1 through N, to help detect intrusion patterns, detect intrusion techniques, and other security problems. That is intrusion detection. That is anomaly detection. Other examples, paragraph 50. And this is what the board referred to as the direct detection method. But there, it talks about after logging the anomaly, you add that to the collection of security information that you use for this network-based approach. And then you can go on and do your general intrusion detection actions. That's what it's called, intrusion detection actions. Such actions can include monitoring all the incoming data, the packets. You can recognize attack patterns, report possible intrusions, and so on. So how this isn't detecting anomalies is beyond me. But if we look at paragraph 77, in a detailed description of the actual configuration for the network server 104, it describes that it has a, quote, anomaly detection mechanism 528. This is at the central node. So the plain and express disclosure of the AppsMith reference clearly teaches that what's going on is you're receiving information from the nodes. The central server is looking at that information with the benefit of a And it's determining whether or not there's an anomaly or an intrusion. Suppose, hypothetically, that the central computer did only one thing, which was to count the number of anomalies detected by the peripheral computers and then made a decision as to what action to take based on that. Would that be within the scope of Claim 41? The central server is simply counting the number of anomalies? Yeah. It receives, there are 10 peripheral computers, it receives only from those computers information that an anomaly was detected. I think that the number of events is one of the ways. Now, there's nothing detailed in the OA-4 pattern. Just what's the answer to my question? I think the answer is yes. It would be covered? I think it would be covered in that you're making a new determination. Is there an actual problem here? We've seen these events coming in from multiple nodes, and based on that broader scope of information, there is some algorithm that is determining you've exceeded the threshold where we think there's an issue here. So I think simply counting and making a determination whether this is a real problem would help. Counting the number of anomalies would be sufficient? Counting the number of anomalies in the context of AlkSmith, that there's something strange going on here, we're sending it up to the central server. There's more in AlkSmith. AlkSmith, the central processor, is doing more than counting the number of anomalies that are received. It's actually doing an analysis. Right? Correct. Okay. The prosecution history cited by Intellectual Ventures does not support the disavowal language that was suggested this morning. The host-based analysis that was referred to in the prior wasn't host-based analysis followed by sending reports from those hosts to a central server to do further analysis to determine if there's an actual security threat. So there's no foothold in the prosecution history for them to extrapolate to where they went this morning. What was that? Were there – this is Rowland or Rowland that was being distinguished? Correct. And was there no sending of information either collected or developed at the host to anywhere else? Not that I can recall, and it's certainly not in the record that they've made below or – And not part of the discussion in the PDO. Not that I can recall, no. If I could turn quickly to the cross-appeal issue, which is – Yes, please do. So our cross-appeal deals with Claim 33. Claim 33 is a dependent claim that introduces the additional limitation that once the anomaly detection sensitivity and alarm thresholds. There's very little guidance in the 084 patent as to what those two functions mean. If we look first to column 8 around line 30, it says, Second, upon detection of suspected reconnaissance and probing, the detection process can adjust its matching parameters and alarm thresholds to focus sensitivity on attacks from suspected sources and against specific targets. It doesn't support – this portion of the specification uses this term, as does Claim 33, very generically, these terms. It's not like there's a specific alarm threshold that is adjusted in these firewalls or a specific anomaly detection sensitivity knob that's adjusted. These are generic terms to describe the situation where we've now seen – that there is this security problem. In the future, we're going to be on the lookout for this security problem. And so certain parameters have to be adjusted in order to more easily detect that anomaly in the future and issue alarms, if appropriate. The only issue that was raised was Section 102 anticipation. Is that right? Nothing under 103? Correct. In the Outsmith reference, it teaches, in paragraph 54 – well, let's start with paragraph 52, actually. There it says that, in the second sentence, the agents,  immediately are able to check for that anomaly and examining information arriving at its respective client terminals. So they're informed of the anomaly and they can check for that anomaly. And then in 54, it's updating the Firewall 112 and the notification of the anomaly may include updating the collection of corporate security data, 120, to include information about the anomaly, modifying security procedures to account for the anomaly, or performing other similar tasks. So you're modifying security procedures to account for the anomaly. In other words, when we see the anomaly, if it comes in again, we're going to more easily detect it and alarm, if appropriate. Now, the board rejected – the board had declarations from two experts, our expert, Dr. Kessides, and their expert, Dr. Goldschlag. The board rejected Dr. Kessides' testimony because it focused on later paragraphs in the declaration. In paragraph 145, Dr. Kessides walked through the logic of, if we've now detected an anomaly, we've added that to our collective knowledge of potential problems, and we're able to account for the anomaly by modifying our security procedures. He testified, from one skill in the arts perspective, that means you've adjusted anomaly detection sensitivity. What else could that mean? And alarm thresholds. They overlooked – the board, unfortunately, overlooked that portion of the testimony. There were some other claims that had the same dependent claim limitation, so that was addressed in an earlier portion of his petition, or his declaration. And they overlooked that testimony in their final written decision. And they did so at the board's – I'm sorry, at Intellectual Ventures' suggestion. During oral argument, Claim 33 was given somewhat short shrift as far as the argument went, but during the oral argument, IB's counsel said that we had a slide for paragraph 145 of Dr. Kessides' declaration, and they told the board that that was unrelated to Claim 33. So we think that the board accepted that invitation, even though we reminded the board on rebuttal that it wasn't. But didn't look at the logic contained in Dr. Kessides' declaration with respect to this. And in doing so, the final written decision, as far as Claim 33 is concerned, is not supported by substantial arguments. Thank you. We'll take some rebuttal time on the cross-appeal. And Mr. Picard, in addition to whatever rebuttal you have, let's concentrate on the cross-appeal. Absolutely. First of all, Commerce Bank raises a substantial evidence review question for this panel. The board was provided with competing expert testimony on whether Claim 33 was anticipated by Oxmuth. And I think if you read the opinion, it essentially said that Commerce didn't make out its burden, and it's clear to see why. If we look at Joint Appendix 614, this is the Kessides declaration, Paragraph 178. And all Dr. Kessides does is put side-by-side block quotes from Oxmuth in the claim language. There's no analysis there. On the question of whether the board overlooked what was provided in Paragraph 145, that's not a fair criticism. The board's final written decision cited Paragraph 178. If we see here, 178 refers back to the analysis, notwithstanding that the board's not required to cite every piece of evidence that it considered in coming to the decision. Can I ask you to address Paragraph 54 of Oxmuth? Yes. And one of the things it teaches, and I guess this is the crucial allegedly anticipating portion of Oxmuth for Claim 33, is modifying security procedures to account for the anomaly. What would be an example of that that is not one of the two things listed in Claim 33? For instance, the Server 104 could terminate communications between the network and one of the network modules, and that would not involve changing a detection sensitivity or an alarm threshold. And I think it's important to keep in mind Dr. Goldschlag, intellectual ventures expert on this point, provided competing expert testimony on what's disclosed in Paragraph 54 and simply said that the skilled artisan wouldn't have understood this to disclose the unique features that are provided in 33. If you put that up against Dr. Kosaitis, as the board did. I don't remember, did Dr. Goldschlag say, here are other measures that the system could take that were different from these? He did not. There's nothing in the record about what other... Both sides' testimony seems to me to be at an extraordinarily high level of generality without concretely talking about what's actually going on, which if they have the burden, maybe they lose for that reason alone. They do have the burden, yes. And I think that's why their appeal fails. They have the burden. And if the board is free to credit Kosaitis' completely conclusory testimony, it's certainly free to credit Dr. Goldschlag, who frankly provides something more than Kosaitis. So we respectfully ask that the board affirm the... this court, excuse me, affirm the board's non-anticipation findings to Claim 33. Thank you. Mr. Van der Tweeg and Henry Bettle on the cross-appeal. So Dr. Goldschlag made the same error that the board did. Dr. Goldschlag did not report, did not respond to Dr. Kosaitis' testimony in Paragraph 145 of his declaration either. And the criticism that the board... What page are the records on? What page is Paragraph 145? It's on Appendix 596. So the criticism leveled by the board against Dr. Kosaitis says that Dr. Kosaitis' testimony just repeats the language from Alksmith quoted above and concludes that Alksmith discloses each and every limitation of Claim 33. That criticism is only fair if the board's analysis was limited to the claim chart that appears in Paragraphs 178 to 181 of Dr. Kosaitis' declaration. The logic that Dr. Kosaitis explained is one skill in the art of when you receive this information and you're modifying security procedures to account for the detected anomaly and therefore you're just necessarily adjusting these sensitivity so that you can detect it down the road. And the problem is the board doesn't have to believe it, right? That's your difficulty. Between the two experts, you had Dr. Kosaitis explaining the logic and from his viewpoint what this means. And you had Dr. Goldschlag saying, basically, I don't see these words in Alksmith. And they haven't explained why these words are present. The board, that kind of testimony that I've read in Alksmith and I tell you, board, that it's not there from Goldschlag, that exact type of testimony was rejected in another portion of the board's opinion as too conclusory to support their position. So we would say Dr. Goldschlag's conclusory testimony doesn't withstand the logical conclusion that one would reach reading paragraph 52 and 54 of Alksmith along with the interpretation of those provisions provided by Dr. Kosaitis. Again, there's no specific parameters disclosed in the 084 patent relating to alarm thresholds for anomaly detection sensitivity. And, in fact, the reason why that is is described in column 11 around line 44. It says that it is contemplated that in addition to notifying the firewall or their host device of an impending attack, the system could control the firewall or other host device to reconfigure or adjust pertinent parameters in anticipation of the attack. For each type of device, the parameters controlled or adjusted would be different and so on. So the 084 patent isn't, in the Claim 33, isn't talking about specific parameters that are adjusted. It's going to depend on the device. It was just talking about once you've got the benefit of this anomaly that's been detected, to in the future be better able to detect and control alarms. Okay. Thank you. Thank you. Thank you both. So this case is taken under submission.